The next argument is in Appeal No. 06-5007, TEG-Paradigm Environmental v. United States. Good morning, sir. How are you? Good morning. Is it Hayes or Haas? Haas. Haas. Very well. Please proceed. Robert C. Haas, the Curriculum for the Appellate, TEG-Paradigm Environmental. Let me first address the work plan issue. The Court of Claims determined that the work plan was merely to assess the contractor's qualifications to do the job. At its opinion, at Appendix 24, I'll quote the Court, A work plan such as plaintiff's, on the other hand, is utilized in making the mandatory determination of responsibility or performance capability, which is evaluated at the time of the award. And then it goes further. The work plan is a document intended exclusively to determine the contractor. How does the work plan help us escape the clear language of the contract, which said they had to remove all visible asbestos? I'm not dealing with that point now. That has to do with the… Well, how is the work plan going to… Well, it's a very different issue. It is because the contractor's work was interrupted. If you… I'm saying it was interrupted during discussions with respect to the work plan. In other words, the contractor was saying, I should be able to perform in accordance with the work plan, and there were discussions, and work was suspended for a period, and that was the delay. If I just may review that for a moment. But that's the thrust. It's a delay claim, isn't it, basically? Oh, no, that's only part of the delay claim. The government has acknowledged the work was delayed six weeks just looking at the contract. The point is… Because of this work plan, the BEC issue. It all comes back to the same issue. Your company continued to follow their work plan instead of following the specifications. The specifications required them to remove all visible asbestos, which means they were going to have to grind, if necessary, to get it out of the crevices. Two very different considerations. I don't see how you can divorce one from the other. The problem is they continued to use the water pressure spray method when that wasn't solving the visibility problem. Isn't there a relationship there? Let me try to persuade you. Please. The work plan was a pre-submittal requirement. Sure. Many other requirements… Can't change the specifications, though, right? The solicitation required it. The work plan was submitted at the time of the bid. It was reviewed, changed, reviewed again, changed, accepted. And the contract was awarded, and this work plan had to do with the means, the methods, the equipment, the material, and the contractor proceeded by it. There was no question that he was going to use these high-pressure hydroblasting devices. But so what? In the end, you have to be saying that your work plan had methods which had to be accepted by the agency even if they didn't produce the result the specifications of the contract called for, right? Isn't that what the bottom line is here? The bottom line of the work plan issue is that the contractor's work was interrupted. It was stopped. It was delayed for six weeks. It had nothing to do with… Because it wasn't complying with the specifications and requirements of the contract. Your Honor, that's not so. The government liked the work plan. They, in their writings, say the work plan was something they wanted to adopt. They recognized that these specifications were canned. They were designed for some other unoccupied… Are you or are you not contending that the specifications were trumped by the work plan? Yes. That's what I thought. So then we get back to Judge Rader's question. Well, how can that be? Because it's fundamental in government contracting law that the specifications are what the definition is of the work to be performed by the contractor, and they don't get trumped by submittals that the contractor makes. The specification is written by the government, and the contractor either does it as specified or doesn't, but the contractor doesn't get to rewrite the specifications to make the job easier. The government recognized the specifications were deficient. For example, for an occupied building, where they had such things as wrapping ductwork and encapsulating it and putting visqueen on the floors so the carpets wouldn't get dirty and so forth in a building where the ductwork was all going to be removed and the building demolished. Well, the specifications may have been stupid. I don't know. But under contract law, normally they're what govern. And you seem to be arguing, when I try to peel away the surface, that we can ignore some of the specifications because they're inconsistent with the work plan and that in a contest between the specifications as written, right or wrong, and the work plan, you say the work plan should govern. Right. The government itself wanted to. Is that your position or not, that the work plan trumps the specifications? The government agreed to the work plan. And are you saying that therefore the specifications are washed away? To the extent they're modified by the work plan. So the work plan did trump or modify the specifications? I say that. To the extent, you know, they went through all this process laboriously for a month to revise the work plan and get it what the government wanted. Isn't it the norm that if specifications are going to be changed, there has to be a modification of the contract to change them, which didn't happen here? Well, this is the government's responsibility, it seems to me. They accepted the work plan. But not as rescinding any of the specifications. They accepted the work plan and expected you to meet the specifications. They did accept it as modifying the specifications. What's the evidence of that? They never changed the specifications. Ever since, they've been trying to enforce the specifications. I don't see what evidence you can point to that they agreed that the specifications were washed away to the extent inconsistent with the work plan. The government observed in its writings that the specifications were deficient and the work plan was superior. They wanted to adopt the work plan. That's why they proposed the BECP. And they did enter into the BECP, which is simply a reincarnation of the work plan. Well, Mr. Haas, there were changes in the specification. We started out with the friable, non-friable distinction. And that was perceived as being too difficult to implement what was going to be friable and non. And so they went to this visible standard, and it was understood by all the contractors at the time. How can we now presume that that was modified by the acceptance of a work plan, which of course does not change the specifications. The work plan did not purport to modify… So they still had to remove all visible asbestos. All visible residue. Yes. The stuff in the cracks too, which is the problem. Well, the first specification said other than that, which was in the cracks in the floors. And that was changed. That was the friable, non-friable one. They changed that. I think they improved the specifications by that change. No question about it. So the question is, what is residue? And what is a surface? And what is visible? Yes, what's visible. But if it's not residue, even though it is visible, it doesn't have to be removed. That was a big issue. Mr. Haas, on the work plan issue, though, getting back, I mean, if you look at 428 of the joint appendix, JA 428, that seems to set forth what had to be presented in the work plan. And the kinds of things that are set forth there, superintendents, who's going to be the superintendent, how you're going to control pollution and various other things, the project schedule, emergency procedures, none of this seems to speak to be addressing really specific job requirements. It's sort of collateral items, like what's the contractor's emergency plan and so forth. I mean, these don't seem to be the kind of things that relate to the actual contract performance. Judge Schall, if I may refer you to the appendix 531, which is a letter, long letter of the government's engineers, where it dealt with the contractor experience, qualifications, references, professional business, bonds, and found all those to be acceptable as of April 16th. No, I understand. And there's no, you know, I mean, there was, as I understand it, there was an initial version of the work plan, then a second version, and then it was finally accepted. And it was separate from all this qualifications business. But, I mean, some things were accepted. But what I'm saying is it doesn't seem like the items that were required to be addressed in the work plan don't seem to speak to the kind of issues that we're dealing with today, like what you were just discussing with Judge Ray. The clearance. Exactly. I agree with you. Now, the clearance is a close, fine, technical, tough issue. I had trouble with that from the very beginning of this case. But we're talking about the term residue. Now, here where the record shows, they did some work on these bills before with another contractor, and they scraped the asbestos off by hand. This contractor went out and bought the very latest in technology, machines with 35,000 pounds per square inch pressure, and they were satisfied that was going to remove everything. And it did. There weren't any surfaces. They were gone. The surfaces, the concrete, the residue, it was gone. And I think that there's some significance that the contractor never changed his $5 million bid because it was confident that this equipment would do the job, and it did do the job. Well, not according to the company hired to be the umpire of whether there was adequate residue removal. That company said, no, there wasn't. That is, there was a conflict between the observation services contractor, who incidentally was described as being fanatical by the government. It doesn't matter. The contract made that company the umpire, not your company, not me, not somebody else, that company. And they found that the requirement to remove residue was not met. Well, the government's own engineers, the ones that had drafted the original specifications and drafted the change in the specifications, on November 30th of 1997, after inspecting the work, wrote the government and said the material is not expected to remove this embedded, recessed material. Yeah, but that's not what the contract said. That's what a consultant said. It's not what the contract said. He's saying what the contract said. No, no, the contract said no traces of debris or residue are visible by the observation service contractor. It did not classify it as residue, apparently, because it was below the surface. Whether it's residue or not, it still has to be invisible. It still says whether it's debris or residue or traces, it still cannot be visible by the observation contractor. Well, we have the government's own opinion from its engineers. We have the opinion of the eminent representative of the American Society of Testing Materials, who provided the statement that plaster or paint embedded in the cracks, pores, and fissures of concrete wall, if it can reasonably be removed or released, may be defined as residue. However, it is unreasonable to require a contractor to chisel or grind away concrete to extract such embedded material, even if it was asbestos-containing. And that's what they made this contractor do. They made him use hydraulic chippers and grinders to dig out this concrete. I don't think anyone ever contemplated that. The government's own engineers found that to be unreasonable. But you're not making a claim, though, here, as I understand this, of overly burdensome government inspection. You're claiming here's what the contract required. The government said it had a different view of what had to be removed. No, I've always concluded the contract did not require this contractor to dig into the cracks and pores and chip out the concrete. And that's what the experts have said. And I don't know. Maybe we can get a lot more testimony on this someday. But I agree. It's a little unclear. It's a tough question. All right. Thank you, sir. We'll hear from the government now. We'll give you back a minute of rebuttal. Mr. Aberbach? Thank you, Your Honor. May it please the Court. This case is about the plain terms of the contract and what is and what is not part of the contract. Was there some need for material and possibly including asbestos and small cracks or pores to be removed? Was there some real practical purpose for that? Certainly there was, Your Honor. What was it? In order to make sure that an implosion was conducted properly for safety concerns, things like that. But as the Court noted earlier, the wisdom of what the government contracts for is not to be second-guessed. The government can do things that are, as the Court raised, stupid. I'm not contesting that the government can demand whatever level of performance it specifies. I'm just asking you as a practical matter, why was it important to hand-drill out of cracks and crevices little bits of residue? Because of the potential that asbestos would be released into the air. Mr. Aberbach, this, as a legal matter, presents us with one of those ill-defined areas of the law. When do we consult trade practice? In theory, if we consult trade practice to determine the meaning of the terms of these contracts, we might take into consideration some of the evidence that Mr. Haas talked about with individuals involved finding that this was sufficient to remove the residue. On the other hand, if we look at the language of the contract without consulting trade practice, we reach a different conclusion. When should we consult trade practice? Your Honor, this Court's opinions in Hunt and Jowett make clear that consultation to— Only when it's not ambiguous. Only when it's not ambiguous or when necessary to—when there's a distinction between the common-sense English meaning of a term. But metric constructors, which came a few years before Jowett, said there's a problem here in determining when you consider trade practice to determine ambiguity. Correct, Your Honor. And the Court— Can we consider all this evidence of trade practice to decide what the meanings of the terms visible and residue are in this specification? Yes, Your Honor. When, as stated in Hunt and Jowett, when there's a distinction between the common-sense terms and the technical terms. In this case, there is no distinction. In this case, the plain terms of the meaning residue of debris indicate that—and consistent with the rest of the contract— that anything that is lodged but nonetheless visible within the nooks and crannies of the concrete needs to be removed as part of the contract. Is there a possibility that there are two trade practices, one for buildings being rehabbed and another for buildings being imploded? That's possible. I don't have anything— Well, the government explained in its briefs that one of the reasons for this total removal was so that they could recycle the material. And that recyclable material couldn't have any asbestos. It had to have 100 percent removal. But still, that requires us to determine whether industry practice recognized that as a reasonable interpretation of this contract language. I think it's correct to say that the context—and this is from the Metro case as well—that the context in which the contract is written certainly bears upon the court's determination of whether or not the terms are ambiguous or unambiguous. But those factors need to be secondary to the plain language of the agreement. But if the language was so plain, why did the government itself hire a consultant and ask that consultant to determine what had to be removed and what didn't? If the government was sure that the language was unambiguous, no need to hire a consultant, spend a lot of money, waste a lot of time. We already know the answer. Visible means visible. Your Honor, what the consultant was asked to do—and this is on page 673 of the record—was simply to explain what the industry standard was. But if the government's view was our contract specification was deliberately higher than the industry standard, then of what point is it to spend time and money to ask a consultant what the normal industry standard is? Because that's not what you want. That's not what your contract called for. You deliberately didn't call for that. So why ask somebody and spend money to have them tell you what the trade practice is? Your Honor, I don't think it's necessarily a bad idea to try to resolve a dispute with a contractor. And in this case, that's precisely what— That's a matter of negotiation. That's not a matter of definition. Why did they consult trade practice if visible is unambiguous? Well, the term that was being consulted with respect to wasn't the visibility, but the question of debris and the question of residue. And that was the— Yeah, but both residue and debris under the terms of the contract have to be visible, no traces visible. Whether it's residue, debris, there can be no traces visible under the language of the contract. In this case, the contracting officer might well have simply issued what ultimately became the same decision in the final decision, which is— Well, they did. They ultimately went against their ACT, whom they consulted. That's correct, Your Honor. It didn't need to consult ATC. Nonetheless, in an abundance of caution, it consulted. And incidentally, there are a number of instances with respect to which ATC was consulted, and this was part of the scope of the services being provided. If the government planned, once it did the modifications seven and eight of the solicitation, to specify and enforce total removal of every speck of asbestos anywhere, including in cracks and crevices and so forth, then why didn't the government react negatively when, despite acknowledging receipt of those modifications to the speck, the contractor didn't raise his price $1? If you upped the penny of what was required and he didn't up his bid price, wasn't that very suspicious? Wouldn't that have put the government on notice that he didn't understand how much of a harder job this was going to be? Your Honor, the petitioner's citation to deposition testimony from Mr. Barbero indicate that Mr. Barbero didn't raise the price because he believed that the water blasting would be adequate in order to comply with the specifications. Yeah, but what did the government believe? That's what I'm asking. Usually the government, if they add to the specifications and the price doesn't go up, they usually go back to the contractor and say, wait a minute, you maybe don't understand. We just made this job twice as hard and you didn't raise your bid. Maybe you don't realize we really mean it's going to be twice as hard. Mr. Barbero, during the pre-conference, pre-award telephone conference, during the telephone conference, during the solicitation, specifically stated that he understood the difference between what was originally the friability standard and the non-friability standard. And specifically the visibility, the standard that was ultimately removed from the contract and what ultimately became the text. And Teg was not only constructively, but in fact on notice of this distinction. And the government was certainly entitled to rely upon Mr. Barbero's statement to indicate that Teg understood the distinction and was fully aware of what it was bidding on. Mr. Auerbach, in this context where you had the government itself consulting outside sources to determine the meaning of residue and traces, why isn't Mr. Haas correct that maybe the work plan was an additional thing that this court can look to? The work plan was accepted. Everybody was trying to figure out what they should do. Maybe they had already decided what they could do with the work plan. Your Honor, the one thing Mr. Haas was correct about is that the distinctions between the work plan and the contract did not have to do with the visibility issue. The issues that were raised and that the parties argued about for some period of time was not whether or not the traces had to be removed. It had to do with a number of other safety type issues about backup power necessary to perform the job and things like that. Counsel, the assertion made repeatedly in the brief and orally here by Mr. Haas that the work plan was accepted, I thought I read in your brief a denial. You said, no, no, the work plan was never accepted, which is? Mr. McKnight was asked during his deposition testimony, was the work plan accepted? And his response to that question was, well, it was never not accepted. What the government did was to award the contract following the submission of the work plan. But in no event was that award of the contract to be deemed a modification of the terms of the contract. I'm not asking about whether it counts as a modification. I'm asking in what sense and with what consequence was it, quote, accepted? The acceptance, the only form, there's no statement, there's no letter in the record stamping the work plan. Well, isn't it true that it was repeatedly changed at the suggestion of the government? And then at some point the government had no further suggestions, and therefore it didn't ask for any further changes, and therefore it became final, which maybe we could call an implicit acceptance. There are several reasons why that theory doesn't hold up, the first of which being that the idea of an implicit acceptance is contrary to the ANA installation contractor's decision that was cited in the brief, which indicates that to the extent that a contractor seeks to modify the terms of the contract through a submittal, the actual modification has to be clear and unambiguous. No, no, but I think what Chief Judge Mischel is asking about is just about whether the work – I mean, certainly it was a requirement of the specification that a work plan be submitted. One was submitted, the government said, no, it's not correct. They came back with another version, the government said, no, there's still some problems, and finally there was another version, and there was no further discussion about it. I think what Chief Judge Mischel is getting at is just in terms of the requirement that a work plan be submitted, did there not come a time when something was presented and the government had no further comments about it and they went ahead with the contract? So can't you say, leaving aside any issue about whether the work plan changed the contract, isn't it fair to say that at that point there was an implicit acceptance of the work plan, whatever the work plan stands for? I don't think that that next assumption that Your Honor's question suggests is fair because of the context. But does it make any difference to this case? I mean, they had to submit a work plan. A work plan came in, it was revised, and eventually there was no further discussion about it, and they went on. Now, that's separate from the question as to whether what was on the work plan became part of the contract. I mean, you can – there can be an accepted work plan, but that doesn't mean the contract's been changed. I would agree with that point. Then why don't you say the work plan was accepted? Because – As a work plan, not as a modification of the contract, but as a work plan for whatever work plans are. It just makes it clearer. I mean, nobody's fighting about a work plan eventually being accepted in terms of, okay, we have a work plan, we can go ahead with the job. That's not to say that the work plan changed the job. That's correct, Your Honor. You're making your argument more difficult than you have to. Fair enough. I won't go any further than in so doing. The only point I want to make clear, and the Court's question earlier suggested as much, was that the work plan was made as part of the determination of responsibility as distinct from a modification to the contract. But Judge Rader asked a question that I'm not sure you've given a full answer to. He says, as I recall, aren't we allowed to at least look at it and consider it, even if it doesn't modify the specifications in the contract? But isn't it a permissible source for the reviewing court to look at along with all the other documentation? You're referring to trade practice and things of that nature? No, no. The work plan. Isn't the work plan a document we can consider in making our decision? I'm struggling with that question because, as I tried to explain, the work plan doesn't shed any light on the issue of the degree to which asbestos needs to be removed. Well, that's your opinion, and if we agreed with it, then obviously there would be no impact. But suppose that we do consider the work plan, and suppose we have a different view of it than you, and we think that it actually does shed some light on what the contract required, what the two parties had in mind, what the mutual intent was. In that event, it would conceivably be a different outcome. Your Honor, I indicated before that the metric case that we've cited and other cases, both in this court and in the Court of Federal Claims, indicate that the context in which terms are arrived upon can be important in determining what the plain meaning of the contract is. And so it would be prior to the time that the court lets in extrinsic evidence to ascertain the party's intent. But in this case, the plain language of the contract is what controls. And I think it's important to note that for all the talk about surfaces and all the talk about debris, the language of the contract indicates that it's not surfaces that are to be cleaned. It's asbestos-containing materials that have been applied to surfaces need to be cleaned. And as the Court of Federal Claims indicated, such materials may, in fact, settle in the pores of the exterior walls. I see that my time is up. All right. Thank you. Mr. House, we've given you back a minute for rebuttal, even though your time was all expired. Do you have a rebuttal argument? Well, I think I'd just like to read a passage from the law. Here's the inspector's comment. He arrived on the site, the previous inspector. He informs me that the rules of the visuals will change. ATC seems to be very lenient on their definition of clean, but we will continue to do it our way until we get written notification to proceed otherwise. And then Mr. Caskey, the representative of the government's engineers, in his letter states, the next day, residue recessed within the pores and cracks of the concrete substrate is not expected to be extracted. But, Mr. House, can we, under the law, treat a contract as amended because of what is said in an exchange of letters between the contracting parties? Aren't we limited to the contract itself? And any side correspondence ordinarily wouldn't be thought to have the power to change the actual contract. I would say we're not amending it, but we're understanding it in light of the people who are supposed to know, the engineers who drafted the specifications. Well, would you agree that such illumination of the issues of the meaning of the contract would require that we first find that some important phrase or word in it is ambiguous? I wouldn't use ambiguous. I would say misunderstood. Not known. That's my problem. Doesn't the case law mostly talk in terms of resorting to extraneous materials if the contract language and the contract itself is ambiguous? That seems to be the test in the law. If we can't find ambiguity here, then maybe we're not allowed to look at the letters you're citing. Perhaps it is ambiguous. We're in an area of reasonableness. And certainly, Mr. Oberta, the ASTM expert, says it's unreasonable. All right. Your position, Mr. Judge Hall? Toss, I have one question. As I understand it, the final version of the work plan is at Joint Appendix 565. It's the May 2, 1997, submittal labeled Revision 2. What provision of that work plan do you contend changed the contract? In other words, there's got to be some provision in here that is different from something in the contract and, in your view, altered the contract. What of those various provisions in that document of JA 565 do you say changed the contract? I don't believe this work plan did change the contract, except it became part of the contractor's obligation to perform the work as outlined in the work plan. But I thought that's what we've been arguing about, that the work plan allegedly altered the contract in some way. Well, I haven't argued that. I don't think. All right. Thank you both. We'll take the case under advisement.